(February 8, 1924.)

MARTIN ALBRETHSEN, in Behalf of Himself and in Be-
half of All Other Persons Similarly Situated With Him,
Plaintiff and Appellant, v. WOOD RIVER LAND
COMPANY, a Corporation, Defendant and Respond-
ent; BIG WOOD RIVER RESERVOIR AND CANAL
COMPANY, LIMITED, Intervenor; IDAHO IRRIGA-
TION COMPANY, Intervenor, and JAMES FARMER
and All Other Users of Water from Big Wood River
Similarly Situated With Him, Intervenors and Appel-
lants.

[231 Pac. 418.]

WATER AND WATER RIGHTS—ABANDONMENT—CONFLICT OF EVIDENCE.

1.  Where abandonment is alleged against a prior appropriator,
and it appears from the measurements made of his canal system
by competent and experienced engineers, including those in his
employment, that his canal does not have capacity to carry the
amount of water decreed to it, and it also appears that such
excess has been returned to the stream and diverted and used by
subsequent appropriators, after the lapse of more than five years
such prior appropriator will be held to have abandoned such
excess.

2.  Where the measurements of a canal are made by expe-
rienced, competent engineers on behalf of both parties, and they
agree that its maximum capacity is not sufficient to deliver the
amount decreed to it, and there is evidence by witnesses who
testify that in their opinion it has carried the maximum, such
opinion evidence is not sufficient to overcome the testimony of
the actual measurements and support the finding that it will carry
the maximum claimed.

3.  It is fairly well settled that the carrying capacity of an
irrigating ditch or canal may be determined with reasonable cer-
tainty by competent engineers, who have had experience in this
class of work.

APPEAL from the District Court of the Fourth Judicial
District, for Blaine County.  Hon. Charles F. Reddoch,
Judge Presiding.

40 Idaho—4

Action to declare forfeiture of certain waters. From judgment for defendant, plaintiff appeals. *Reversed* and *remanded*, with instructions.

Bothwell & Chapman and Sullivan, Sullivan & Van Winkle, for Appellant.

Four thousand inches of the waters of Big Wood River decreed to W. T. Riley, December 13, 1909, in the case of *S. C. Frost et al. v. Alturas Water Company et al.*, and now claimed by the defendant, has been lost and abandoned by a failure for the term of five years following said decree to apply 4,000 inches of said right to the beneficial use for which it was appropriated. (C. S., sec. 5582.)

Richards & Haga, for Respondent.

"Forfeitures are not favored and must be clearly established." (*Ada County etc. Co. v. Farmers' Canal Co.*, 5 Ida. 793, 51 Pac. 990, 40 L. R. A. 485.)

"Courts will not lightly decree an abandonment of a property so valuable as that of the water in an irrigated region." (*Miller v. Wheeler*, 54 Wash. 429, 103 Pac. 641, 23 L. R. A., N. S., 1065.)

A party claiming an abandonment must establish the fact by clear and unequivocal evidence. (*Beaver Brook Reservoir Co. v. St. Vrain Reservoir Co.*, 6 Colo. App. 130, 40 Pac. 1066.)

"The decision of a court when sitting in a trial of a cause is of the same force and effect as a verdict of a jury in a jury trial and where there is a substantial conflict in the testimony, it is the duty of the appellate court to confirm the decision." (*Sabin v. Burke*, 4 Ida. 28, 37 Pac. 352; *Stuart v. Hauser*, 9 Ida. 53, 72 Pac. 719; *Cowden v. Finney*, 9 Ida. 619, 75 Pac. 765; *Heckman v. Espey*, 12 Ida. 755, 88 Pac. 80; *Lindstrom v. Hope Lbr. Co.*, 12 Ida. 714, 88 Pac. 92; *Flynn Group etc. v. Murphy*, 18 Ida. 266, 138 Am. St. 201, 109 Pac. 851; *Western Moline Plow Co. v. Caldwell*, 18 Ida. 463, 110 Pac. 533; *Salisbury v. Spofford*, 22 Ida. 393, 126 Pac. 400; *Brinton v. Steele*, 23 Ida. 615, 131 Pac. 662;

*Cameron Lumber Co. v. Stack G. L. Co.,* 26 Ida. 626, 144 Pac. 1114; *Jain v. Priest,* 30 Ida. 273, 164 Pac. 364; *Smith v. Faris-Kesl Con. Co.,* 27 Ida. 407, 150 Pac. 25.)

"It is our duty to give to the findings the most liberal construction the language used will justify in order to sustain the judgment founded thereon." (*Wilkinson v. Bethel,* 13 Ida. 746, 93 Pac. 27; *Eastwood v. Standard Mines etc. Co.,* 11 Ida. 195, 81 Pac. 382.)

WILLIAM A. LEE, J.—This is an action by plaintiff in his own behalf and on behalf of all others similarly situated against the Wood River Land Company, a corporation, to have a portion of its decreed water declared abandoned and lost for a failure on its part, for more than five years, to apply such water to a beneficial use. The several intervenors withdrew their respective pleadings and joined plaintiff in demanding the relief prayed for. There is no controversy between the parties as to the relative position of plaintiffs and defendant and their predecessors in interest as to their respective priorities prior to this alleged abandonment on the part of respondent. The basis of respondent's claim is a decreed right entered in December, 1909, in the case of *Frost et al. v. Alturas Water Company,* in the fourth judicial district court, for Blaine county, wherein one Riley was decreed 5,595 inches of water out of the Big Wood River, with priority from March 24, 1883, for use upon lands described in that decree. Appellant and those who join with him are individual farmers owning lands situated in the Wood River Valley, adjacent to Big Wood River, whose rights are also based upon the decree in the Frost case, which are conceded to be subsequent in time to the rights decreed to Riley, respondent's predecessor in interest.

The controversy between the respective parties to this action, as contended for in their petition for rehearing, arises over appellants' claim that of the total amount decreed to Riley, which was subsequently acquired by respondent, it has, by failure to apply more than 3,850 inches of such

decreed water to a beneficial use during the years of 1910 to 1914, inclusive, abandoned and lost all of said decreed water in excess of this 3,850 inches, and that such excess of approximately 2,150 inches has remained in or been returned to Big Wood River since 1910, and has been delivered to appellants by the water-master in charge of the distribution of the water of said stream, and by them beneficially applied to their respective lands, and that by reason of such abandonment, respondent is precluded from claiming any right in or to the use of the same.

The judgment of the court below was against appellants' contention, and the cause is here upon appeal, based upon the single assignment that the evidence is insufficient to sustain the findings of fact and conclusions of law and judgment entered thereon.

The evidence is voluminous, and we will not undertake a detailed analysis of all of the testimony. The ditch in question, through which respondent has diverted its water since the decree of December, 1909, is commonly referred to as the Riley Ditch, and appellants concede to respondent a right to the prior use of all water that could have been diverted through the Riley Ditch during the years 1910 to 1914, inclusive. But appellants contend that this ditch did not have during this time, and does not now have, sufficient capacity to carry more than 3,850 inches. The engineers who testified on behalf of appellants fixed the maximum carrying capacity of this ditch to be not greater than 2,600 inches. The engineer Sloan testified that in 1919 its maximum capacity at its smallest point, which he fixed as below the highway bridge, was 2,200 inches. The engineer Vernon made a measurement in 1912, and found the greatest carrying capacity of this ditch to be 2,600 inches above the Howard crossing.

Respondent sought to meet this showing made on behalf of appellants by its witness Chapman, who had also been its water-master during several years of this time, who fixed the maximum capacity of the Riley Ditch to be 3,850 inches during one of the years in which he was so employed,

but found that in other years its capacity was as low as 3,100 inches. The witness Campbell, who qualified as an engineer, and who appears to be the witness chiefly relied upon by respondent to show the capacity of its ditch, made a number of measurements during the year 1919. By meter at that time it was only carrying 2,178 inches near the headgate, and another measurement showed 3,404 inches at the same point. His computation as to its theoretical capacity at a point 200 feet above what is known as the Mizer Bridge was 3,863 inches. Campbell made a great number of cross-sections of this canal, and appears to have made an exhaustive effort to ascertain the maximum carrying capacity of the Riley Ditch, and while the measurements at various stations greatly varied, at no time or place does he fix the maximum carrying capacity of this ditch to be greater than 3,863 inches.

Much stress is laid by respondent upon the fact that many of the measurements of this ditch were made during 1918, 1919 and 1920, and it contends that it would not follow that the condition of the ditch with regard to its carrying capacity remained the same during all of this time, or that its capacity at the time these later measurements were taken was the same as it had been during the years from 1910 to 1914, all of which is quite true. But the measurements of the engineer Vernon were made in 1912 and again in 1920, and show that the carrying capacity of this ditch was substantially the same at the time of both measurements. Numerous witnesses testified that they lived in the vicinity of this canal, that they were required to pass over it frequently during this entire period, and that no changes were ever made which would tend to materially increase its carrying capacity at or near the points where the several measurements were made by the engineers who testified in this action. It is further shown that this canal is crossed by a highway by means of a bridge, and also by the railroad in the same manner, and that except for the driving of some additional piles at one time for the purpose of raising the bridge, no change was made that would tend

to increase the carrying capacity of this ditch. While the testimony of the witness Campbell shows that by a comparatively small expenditure the canal could be greatly enlarged at the cross-sections where he found the smallest carrying capacity, it appears from the testimony that in order to make this change it would be necessary to remove earth and rock in place. There is other evidence in the record tending to show that the carrying capacity of this canal at the points where the several measurements were made, upon which its carrying capacity is predicated, has remained substantially the same during all of the years following the Frost decree, to about the time of the commencement of this action.

The parties stipulate that 1,600 inches of water is sufficient to water the land originally reclaimed and watered from the Riley Ditch, and for which the appropriation decreed in 1909 was intended. It appears from the record that no lands have ever been watered or can be watered below the town of Bellevue from the Riley Ditch as at present constructed, but that a spillway exists about 900 feet below the intake of the Riley Ditch, where, for a number of years, the excess water diverted through its headgate and not used upon the lands under the Riley Ditch has been allowed to flow back into the natural channel of the river. For some time respondent company has been selling water out of its appropriation to the Riley Ditch under the Frost decree, such water being taken out of the river and used upon lands below the town of Bellevue. Appellants' counsel suggest that after the entry of judgment below in the instant action, respondent applied to the State Reclamation Department for permission to sell some 4,500 inches of water for use upon the lands below Bellevue, the same to be diverted from Big Wood River near the point of intended use, but even if this be true it is not a matter that can be here considered upon the record before us.

However, it does appear from the record that the Riley Ditch was not so constructed that any of these lands below Bellevue could be watered from it, and that it was probably

never contemplated by the original appropriators for the Riley Ditch that it should water such lands. The stipulation in the record that the right to the use of 1,600 inches of water be conceded for the lands directly under respondent's canal lends color to appellants' claim that the excess water which it claims has been allowed for years to flow back into the river a short distance below the intake of the Riley Ditch, and above the point where the measurements of the canal, as given by the several engineers, were taken, has never in fact been applied to the lands, for which it was appropriated, and that this ditch has never in fact had the capacity to carry all of the water mentioned in the Frost decree throughout its entire length. Respondent cannot at this time rightfully contend for the use of the amount originally decreed to it in excess of the carrying capacity of its canal, unless it made a showing that this excess was diverted and applied to beneficial use in some other manner prior to the intervention of adverse rights, which it has not done.

The highest estimate of its engineers fixes the maximum capacity of its ditch at 3,863 inches. While it cannot be said that there is not a scintilla of evidence in the record tending to support respondent's contention that its canal has carried, at intervals during the time in controversy, the 5,595 inches decreed in 1909, the evidence which it claims tends to support this contention is in conflict with the facts established by its own engineers, who appear to have made a careful and scientific computation of the carrying capacity of this ditch, as well as the evidence of the engineers introduced on behalf of appellants. We think, however, that the testimony of witnesses who do not base their testimony as to the carrying capacity of a canal upon anything more definite and certain than what they are accustomed to in irrigation, and that they can accurately estimate the carrying capacity of a canal some six to eight miles in length, and who express the belief that this ditch had capacity throughout its length equal to the amount decreed to it in 1909, does not create such a conflict in the evi-

dence that this court is bound by the findings of the court below. A conflict in the evidence should have a more substantial basis than this.

It is a well-recognized rule of law that where oral testimony of witnesses, based merely upon opinions or estimates, conflicts with physical facts, such evidence should not be regarded as sufficient to create a substantial conflict in the evidence. As the rule is sometimes stated, where the physical facts are such as to preclude all reasonable probability that the testimony of a witness is true, it being contrary to well-known physical laws, such testimony may be disregarded. (*Cochran v. Gritman,* 34 Ida. 654, 203 Pac. 289; *Chybowski v. Bucyrus Co.,* 127 Wis. 332, 106 N. W. 833, 7 L. R. A., N. S., 357; *Fleming v. Northern Tissue Paper Mill,* 135 Wis. 157, 114 N. W. 841, 15 L. R. A., N. S., 701.)

It is a well-established fact, governed by settled physical laws, that a conduit for conveying water cannot deliver an amount beyond its carrying capacity. It is true that the capacity of any pipe or conduit for conveying water, particularly an open canal, is subject to physical laws which greatly affect its carrying capacity, such as velocity, the coefficient of friction, and other elements which enter into the question, but it is fairly well settled in the scientific world that the capacity of a ditch may be determined with reasonable certainty by competent engineers, and that was attempted to be done in the instant case by both parties to the action. While the estimates of the engineers as to the carrying capacity of respondent's canal varied to a considerable extent, this is usual and perhaps always to be expected where a canal has been constructed under the conditions and in the manner this canal appears to have been built. When, however, the capacity of a canal has been calculated by engineers who have shown competency, efficiency and experience in this class of work, and from the testimony of all of them, including those who made measurements for respondent, it is clear that it has never had the capacity to carry the maximum amount of water claimed by respondent and decreed to it in 1909, and from the whole

record it is clear that this excess has not been diverted and applied to a beneficial use by respondent, it is subject to the rights of subsequent appropriators under the Frost decree, upon their showing that they have so applied this excess.

The location of the measuring device installed by the witness Harkinson, by which the witness Mizer estimated the capacity of the ditch, is not certain, but it must have been at or near the intake, and between that and the spillway. The evidence that the ditch had a capacity of more than 6,000 inches at that point does not conflict with the evidence as to its smaller capacity at the other points where the engineers made their measurements.

For the reasons here stated, the cause is reversed and remanded, with instructions to the trial court to set aside its judgment heretofore made and entered in said cause, and to adjudge and decree that all right, title and interest of the respondent in and to the water of Big Wood River in excess of 3,863 inches has been abandoned and forfeited by said respondent. Neither party to recover any costs.

McCarthy, C. J., concurs.

Budge, J., concurs in the conclusion reached.

Dunn, J., dissents.

(December 12, 1924.)

ON PETITION FOR REHEARING.

WILLIAM A. LEE, J.—Some of the reasons advanced by respondent, and also by the attorney general, who asked leave to join in the application for a rehearing on behalf of certain interests of the state that may be adversely affected, merit attention.

It is claimed that the value of certain land, upon which the state has made farm loans out of a public fund available for that purpose, will be seriously impaired in value if the

foregoing decision is to be the final judgment of this court. If this were a question that we could consider upon the present record, the claim is met by a counter-showing by appellant that the state would suffer far greater loss by reason of the impairment of the value of the water rights belonging to a much larger number of farm loans in which the state is interested, if we had reached a contrary conclusion. We conclude that this is not a question we may consider upon this record.

The contention that the decision impeaches the judgment of the court in the decree of *Frost et al. v. Alturas Water Company,* referred to as the "Frost decree," presents a question worthy of further consideration.

The 23d finding of fact in that case, upon which respondent's rights, in controversy, are based, exhibit 4, p. 113, reads:

"That the defendant W. T. Riley and his predecessors in interest on or about the 23rd day of March, 1883, appropriated and diverted 6,000 inches of waters of Big Wood River for the purpose of irrigating the lands of the original appropriators of such water, and for the purpose of supplying other persons whose lands *lay under the said ditch with water,* by sale or rental for irrigation and for other purposes," etc.

At page 50 of this exhibit there is a general description by sections, townships and range of the lands that "lay under the said ditch," which shows that all are in T. 2 and 3 N., R. 18 E., and the point of diversion to be in sec. 19, T. 3 N.

Respondent deraigns title to its right to the use of this water by mesne conveyances from the said Riley. While there is no specific finding that this ditch had a capacity of 6,000 inches at the time the decree was entered in December, 1909, it must be conceded that all of the parties to that action and their successors in interest are precluded from attacking that decree upon any question that was or should have been determined in that action. No authority is called to our attention and we have not been able to find

any which involves precisely this question, that is, when and under what circumstances may a right to the use of water based upon a decree be challenged under C. S., sec. 5582, on the ground of abandonment. We are not persuaded that the doctrine of *res judicata* has any application to the facts and circumstances of this case, as respondent contends that it has.

A water right differs from other species of property in that the owner does not own the water itself or have any property right in the *corpus* of the water; all the right which he has is to use the same. This right in the instant case is based upon the Frost decree. It is there held that W. T. Riley, respondent's predecessor in interest, had a valid appropriation for a right to divert and use for a beneficial purpose 6,000 inches of water for the lands "which lay under said ditch" as the same were particularly described in that decree. Respondent's contention, if we understand it correctly, is that the Frost decree having fixed the amount of the appropriation and its application to a beneficial use by means of the ditch or canal system as it then existed is *res judicata* as to the sufficiency of such system to divert and use this amount of water against all parties, and their privies, to that action.

The statute upon which appellant bases his right to maintain this action is C. S., sec. 5582, which in part reads:

"All rights to the use of water acquired under this chapter or otherwise shall be lost and abandoned by a failure for the term of five years to apply it to the beneficial use for which it was appropriated, and when any right to the use of water shall be lost through nonuse or abandonment such rights to such water shall revert to the state and be again subject to appropriation under this chapter . . . . "

We are of opinion that this statute intends that a right to the use of water, although based upon a decree of a court, may be lost by abandonment, unless it thereafter be beneficially used, and that in any action to obtain a decree and to determine the question of abandonment or forfeiture evidence is admissible which shows or tends to show that

after the water had been decreed it had not been put to a beneficial use, but had been abandoned for the statutory period, after the entry of such decree.

One of the most conclusive methods of showing that an amount of water decreed to a particular system has not been beneficially used is to show that the canal or other diverting works through which the appropriation must be diverted and distributed for use does not have the required carrying capacity to divert and distribute the full amount of the appropriation and carry the same to the point of intended use. It is well known that the carrying capacity of any canal system, where the physical conditions of the country through which it is constructed, as here shown to be, may make the carrying capacity of the system, from time to time, a variant quantity.

The law safeguards decreed rights as well as other rights by providing that a loss by abandonment cannot arise until after a failure to apply the water to a beneficial use for a period of five years and this intent must be made to appear by clear and convincing evidence. But a decreed right is not immune from a showing that it has been abandoned and such showing does not impeach the decree upon which such right was based, where the evidence received with reference to the abandonment relates to a time subsequent to the decree. To hold otherwise would defeat a well-settled rule of public policy that the right to the use of the public water of the state can only be claimed where it is applied to a beneficial use in the manner required by law. We think this statute applies equally to rights to the use of water based upon a decree with that of rights based upon an appropriation and actual use and that such abandonment begins at the time the appropriator claiming under a decree fails to apply the water to a beneficial use. And when such failure continues for the statutory period and the other required conditions are shown to exist the right may be lost.

Respondent erroneously argues that in this decision we have departed from the settled rule that this court will not

disturb the judgment of the lower court where there is .con-. flict in the evidence and there is competent evidence to support the judgment of the court below. We endeavored to point out that the testimony of both engineers offered on behalf of appellant fixed the maximum capacity of respondents' canal at about 2,600 inches. One of respondent's engineers, who was also in charge of this canal system as water-master during a considerable part of the time in controversy, fixed its maximum capacity at 3,100 .inches. All this testimony as to the maximum capacity of respondent's canal was rejected, not because such witnesses were discredited but because another of respondent's engineers, Stewart Campbell, gave respondent's canal system a greater capacity. He was respondent's witness and his professional qualifications and credibility were not questioned by respondent. It makes no claim that it was taken by surprise by his testimony; on the contrary, it offered the same, including a very complete and extensive table of diagrams and cross-sections of this canal's capacity, in support of its claim that its canal had the carrying capacity for the 6,000 inches. This witness had long been familiar with this canal system and he fixed its maximum capacity at a station about 200 feet above the Mizer bridge as being 77.27 second-feet or 3,863 inches; respondent's exhibit "D" showing the extensive cross-section measurements made by Campbell. By reference to other parts of the record it appears that this cross-section was taken about 500 feet above the spillway marked on respondent's exhibit "B" as "old spillway" and above the first diverting lateral, or approximately 900 feet below respondent's headgate. Other cross-sections showing a smaller capacity are not considered because they lie below some small diverting laterals.

Where the carrying capacity of an irrigation ditch or canal is a subject of inquiry, and its capacity has been computed by competent engineers for both of the parties, who have testified to its capacity and the court accepts the highest capacity given to this canal by one of these engineers, the party on whose behalf this evidence was offered

cannot complain since all of the evidence less favorable to it has been disregarded in favor of the highest capacity given to the canal by any of the expert witnesses who made measurements.

If a party to an action where the capacity of a canal is in dispute offers expert testimony as to its capacity by a competent engineer who has measured the same, such party should not be permitted to discredit its own expert evidence as to the capacity of its canal by the estimates based upon mere opinion of witnesses who have not made any measurements and who are shown not qualified to do so. We think it may also be taken into consideration that prior to the entry of judgment in this case respondent applied to the reclamation department for permission to change the place of the use of a part of this appropriation decreed to Riley by the Frost decree. From an inspection of respondent's exhibit "F" it appears that it now seeks to change the point of diversion for a considerable part of this appropriation from its present headgate in sec. 19, T. 3 N., R. 18 E., to a point some miles down the river located in the NE. of the NW. quarter, sec. 16, T. 2 N., R. 18 E., and that the lands upon which it is now proposed to use a part of this appropriation lie a number of miles beyond the terminus of the canal system as it existed at the time of the entry of the Frost decree. A request for permission to transfer the right to the use of water from the system to which it was originally decreed and to use the same upon lands that were not within or susceptible of being watered under the old system as it existed at the time of the decree tends to show that the water sought to be transferred is no longer used or needed for the lands to which it was originally decreed.

The assumption of counsel that this decision is a change in the policy of the law as it has heretofore been announced by this court does not rise to the dignity of an argument, and when such claim is considered in connection with the facts of this case we think it is unwarranted. Appellant was a party to the Frost decree and some of the rights that were decreed to him were in point of time almost equal to

the rights awarded to Riley. If respondent's contention is to prevail it would result in appellant's rights all being made inferior to the right of respondent to transfer the water decreed to the Riley ditch, and which water was made appurtenant to the lands specifically described in the findings of the Frost case, to a new canal system several miles down the stream for use upon lands that were not susceptible of being watered by the Riley ditch and which were not within the limits of the system as it existed at the time of the entry of the Frost decree. The right of an appropriator to change the point of diversion or to transfer the water so appropriated to other lands to which such water was not appurtenant is subject to the rights of other appropriators out of such stream, and such change cannot be made where it would adversely affect their rights.

Respondent raises the objection that the decision has not taken into account the loss by seepage and evaporation between respondent's headgate, or intake, and the point where Engineer Campbell found the capacity of the Riley ditch to be 3,863 inches. Its distance is approximately 900 feet and not three-fourths of a mile as stated. There is not sufficient evidence in the record from which this loss can be correctly determined, but whatever such loss may be it cannot rightfully be charged against respondent's appropriation if the canal to that point is being maintained in a reasonably efficient manner.

The application made on behalf of respondent for a rehearing will be denied and the opinion of Feb. 8, 1924, will be adhered to with this modification: The cause will be remanded to the district court, with instructions to take evidence and make findings upon the single question as to the amount of loss by seepage and evaporation in respondent's canal between its headgate, or intake, and the point where the witness, Stewart Campbell, by his cross-section measurements, computed the capacity to be 77.27 second-feet and this loss, if any, added to the amount of water to which respondent is entitled as fixed by the former opinion of Feb. 8, 1924, and with this modification to enter

judgment in accordance with the former opinion. No costs awarded to either party.

McCarthy, C. J., and Budge, J., concur.

DUNN, J.—While I am still of the opinion that the judgment of the trial court should be affirmed *in toto*, I concur in the view of the majority that the seepage and evaporation should be added to the amount of water allowed to respondent.